SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-16-521

| | |
|---|---|
| COURTNEY HOLMES<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br><br>APPELLEES | **Opinion Delivered:** October 26, 2016<br><br>APPEAL FROM THE BENTON<br>COUNTY CIRCUIT COURT<br>[NO. 04JV-2015-47-3]<br><br>HONORABLE THOMAS SMITH,<br>JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

The Benton County Circuit Court terminated the parental rights of appellant Courtney Holmes to her children, K.R.H. (DOB: 10-4-2007) and K.M.H. (DOB: 3-13-2009).[1] On appeal to this court, Holmes argues that the evidence supporting the termination was insufficient under the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901 et seq. We affirm.

### I.  *Procedural History*

In January 2015, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect concerning Holmes's children. In an affidavit attached to the petition, family service worker Jessica Thompson attested that on January 18, 2015, DHS received a call from the Siloam Springs Police Department to report

---

[1]The trial court also terminated the rights of the children's father, John Holmes, but he is not a party to this appeal.

SLIP OPINION

that Holmes had rear ended another vehicle with the children in the car and that she had been arrested for driving while intoxicated, endangering the welfare of a minor, and reckless driving. Holmes had admitted using methamphetamine earlier that morning. In addition, Thompson learned that the police had been dispatched to Holmes's residence the previous day, January 17, for a welfare check because the children had been seen playing in the street with no adult supervision. It was reported that Holmes appeared to be under the influence in that she had stumbled and fallen against a wall. Also, she had not known where her children were but had thought that a friend was watching them. Thompson also learned that the police encountered Holmes earlier on January 18 after Holmes had reported a burglary at her residence. While an officer was speaking with Holmes, K.R.H. walked up with a hypodermic syringe and said that K.M.H. had found it in their backyard. The officer noted that Holmes had appeared to be under the influence. Thompson's affidavit also indicated that there had been several previous investigations on the family but that all the allegations had been found unsubstantiated; however, there was an ongoing investigation into sexual abuse of K.M.H. by her father, John.

On January 22, 2015, the trial court entered an ex parte order for emergency custody. In a probable-cause order, the trial court noted that the ICWA applied and that the parties had stipulated to probable cause. The court ordered Holmes to submit to a drug assessment and drug testing, complete parenting classes, attend "HELP" for parents with kids in foster care, and maintain a calendar of her activities. The trial court ordered that there be no contact between John and his children.

In March 2015, the trial court adjudicated the children dependent-neglected due to neglect and abuse. A review order entered in June 2015 indicated that Holmes had complied with the case plan by attending inpatient drug treatment. Holmes was ordered to, among other things, submit to random drug testing, obtain a drug assessment, and complete inpatient/outpatient drug treatment. Another review order was entered in September 2015 in which the trial court found that Holmes had partially complied with the case plan and noted that DHS had provided services, including a substance-abuse evaluation, random drug testing, substance-abuse treatment, counseling, parenting classes, foster placement, community-resource referrals, visitation, and medical/dental services. On November 5, 2015, DHS filed a petition for termination of parental rights. A hearing was held over the course of three days in January and February 2016.

## II.    *Termination Hearing*

Nicole Allison testified that she had been a child-welfare specialist for the Cherokee Nation for over nine years. She stated that she had qualified as an expert on Indian affairs in over 1,000 cases and had received training in Tribal customs and culture.[2] Allison said that she was notified at the very beginning of the case and had been kept apprised of the services offered by DHS. According to Allison, her job was to evaluate active efforts and ensure that active efforts were made to prevent the breakup of an Indian family. Allison testified that she believed that active efforts had been made by DHS. Allison further testified that DHS should not be penalized if drug-treatment referrals were delayed due to Holmes's having

---

[2]Holmes did not challenge Allison's qualifications as an expert.

canceled her appointments. She opined that Holmes had not made use of the services offered.

Allison also testified that she thought continued custody by Holmes would likely result in serious emotional and physical damage to the children. She said that one of her concerns was the fact that four referrals for drug treatment had been made and that Holmes had left treatment three times. She also stated that Holmes had been referred for intensive outpatient treatment but that she had instead sought inpatient treatment. Allison did not recall Holmes ever asking for transportation but noted that Holmes had attended all of the DHS staffings without ever needing a ride and that she had not had a problem getting to court. Allison acknowledged that having multiple surgeries, as Holmes had, likely impacted her ability to complete inpatient drug treatment. Nevertheless, she testified that, when Holmes left Decision Point for a second time due to a slip and fall, she believed that Holmes should have stayed for treatment because "if she was well enough to come back and collect her belongings, I believe she was well enough to come back and stay." Allison further testified that other concerns were the true finding of sexual abuse of K.M.H. by John and Holmes's failure to protect her child. According to Allison, Holmes had initially stated that she would leave John, but at the next staffing it was discovered that Holmes had been staying in a hotel with John. Allison worried that Holmes would permit John to be around his daughter and that she could be molested again. Allison testified that the children's best interest would be served by terminating parental rights.

Sarah Harper, a foster-care worker at DHS, testified that she was assigned to the case in April 2015. Harper stated that Holmes had completed parenting classes and appeared to

4

share a bond with the children. She testified, however, that Holmes was not economically stable in that she had not held down a job. Harper further testified that Holmes had not completed counseling and that her discharge paperwork indicated that she had been dropped from the program because the counselor had called her three times to set up appointments, and Holmes had missed all three appointments. She also said that Holmes had lived in approximately eight different places and was currently living with people she had met on Facebook. Harper said that she had not been able to drug test Holmes over the previous five months because Holmes had moved around and not provided contact numbers. Harper stated that, although she had been unable to monitor Holmes's drug use, she was confident in saying that Holmes's substance-abuse problem was unresolved.

Harper also testified that the first drug-treatment referral had been made in January or February 2015 and that she had made a referral in May 2015, followed by "re-referrals" in September, December, and the following January. Harper said that Holmes had not yet completed drug treatment. She stated that Holmes had never asked for transportation to attend intensive outpatient treatment but noted that Holmes had been given six months of bus passes, which she had not used. Harper also pointed out that Holmes had given DHS prior notice of her need for transportation to visitation and that DHS had provided transportation for her.

Harper stated that there were approximately 130 potential placements for the children, not including what the Cherokee Nation had found. She said, "I absolutely feel like it's reasonably likely that adoption will occur for these two children." She also stated that CASA (Court Appointed Special Advocates) had found notes written by John in the

children's possession. Harper surmised that Holmes had passed those notes along and believed that this violated the trial court's no-contact order.

Dwight Hignite testified that he had met Holmes the previous Tuesday at the faith-based "Insight Group," which deals with addictions. He described it as a nine-week, low-intensity self-help group. Hignite said that Holmes had sought him out to help with her admitted use of methamphetamine and alcohol.

Holmes testified that she had gone to inpatient treatment at Decision Point in June 2015 and had been medically discharged in July; that she had undergone surgery for a bowel obstruction and had been hospitalized for three weeks; that she had gone back to Decision Point in August and had left again in early to mid-October because she had fallen and had felt pain in her stomach, which concerned her given her recent surgery; and that, when she had attempted to return to Decision Point, the facility would not admit her. Holmes stated that, although Decision Point had recommended intensive outpatient drug treatment for her, she had felt that it would be better if she sought inpatient treatment because she did not have transportation or money for gas. She stated that she had informed someone at DHS that she had no transportation and did not recall having been provided with bus passes. Holmes testified that, although she had a substance-abuse problem at one time, she did not currently have one. She testified, however, that she had made plans to go to Monarch, a drug-treatment facility in Oklahoma, that day because "it would be helpful."[3]

---

[3]A CASA report indicated that Holmes had been referred to Monarch by Allison but that Holmes had not followed through with intake as of January 21, 2016. The report noted that she had entered Decision Point for a fourth time and had received another referral for treatment.

Holmes further stated that she had completed parenting classes and that she had held down a job at a gas station for three weeks but that parenting classes and court dates had disrupted her work schedule. Holmes testified that she had moved five times at most. She said that, although she had told Harper that she was homeless, she had received no help from DHS with housing. According to Holmes, she had applied for HUD on her own and had been placed on a waiting list. Holmes stated that she had stopped counseling only because she had been hospitalized. She admitted that she had not attended HELP and that she had attended only approximately half of the visits with her children. According to Holmes, she had left her calendar of activities at home, and she had no sign-in sheets from AA/NA meetings.

Holmes testified that she was willing to protect K.M.H. from John, but she also testified that she was still married to John and did not know what plans she had for their relationship. Holmes stated that she was aware of the no-contact order but that she had permitted John to speak with the children on the phone.

Sam Wallace, who performed a psychosexual evaluation on John, testified that John had denied having any sexual behavioral problems. He stated that his evaluation indicated that John was at a moderate to low risk of sexual reoffense but that the fact that John would not admit that the abuse had occurred was a significant barrier to treatment.

John testified that he had attempted to reconcile twice with Holmes but that they were not currently together. He further testified that he had not been arrested for sexually abusing K.M.H.

In its order terminating parental rights, the trial court noted that it had made all of its findings based on a beyond–a–reasonable–doubt standard.[4] The trial court found that DHS had proved grounds under Ark. Code Ann. § 9–27–341(b)(3)(B)(i)(*a*) (Repl. 2015) (twelve-month failure to remedy), (vii)(*a*) (subsequent factors), and (ix)(*a*) (aggravated circumstances). In finding that termination was in the children's best interest pursuant to section 9–27–341(b)(3)(A), the trial court found credible Harper's testimony that adoption was reasonably likely and that potential harm could result if the children were returned to Holmes's custody.

The trial court noted that the ICWA applied and that the children were members of the Cherokee Nation. The trial court found that Allison was a qualified expert witness for ICWA purposes who offered credible testimony that the requirements of 25 U.S.C. § 1912 had been met.

### III.    *Indian Child Welfare Act*

According to the ICWA, the party seeking to terminate parental rights shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. 25 U.S.C. § 1912(d). Moreover, no termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the

---

[4]In *Timmons v. Arkansas Department of Human Services*, 2010 Ark. App. 419, 376 S.W.3d 466, this court said that the better practice for the circuit court would have been to employ a dual burden of proof to separate sets of findings under Ark. Code Ann. § 9-27-341 and 25 U.S.C. § 1912(f).



continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f).

### IV.     *Standard of Review*

Termination-of-parental-rights cases are reviewed de novo. *Jackson v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 411, 429 S.W.3d 276. Grounds for termination of parental rights must be proved by clear and convincing evidence, and the appellate inquiry is whether the trial court's finding that a disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

Holmes, however, does not challenge grounds or the trial court's best-interest finding under state law. Rather, she argues that the evidence was insufficient under the ICWA, where the burden of proof in termination-of-parental-rights cases is beyond a reasonable doubt. Ark. Code Ann. § 9-27-325(h)(3)(B). Holmes incorrectly asserts that this court's standard of review is the same as in a criminal case—substantial evidence. *Thornton v. State*, 2014 Ark. 157, 433 S.W.3d 216. In *Timmons*, *supra*, this court noted that Arkansas has not applied the substantial-evidence standard of review in cases involving the ICWA. Findings of fact in civil bench trials are reviewed under a clearly-erroneous standard. *See* Ark. R. Civ. P. 52(a). Although the burden of proof is beyond a reasonable doubt, this court's review is de novo, and we do not reverse the trial court's findings of fact unless they are clearly erroneous. *See Jackson*, *supra*; *cf. Ark. Teacher Ret. Sys. v. Short*, 2011 Ark. 263, 381 S.W.3d 834 (taxpayer must establish entitlement to exemption beyond a reasonable doubt, and

standard of review is whether findings of fact were clearly erroneous); *Merriman v. Yutterman*, 291 Ark. 207, 723 S.W.2d 823 (1987) (right to reform deed must be established beyond a reasonable doubt, and standard of review is whether trial court's decision was clearly erroneous); *Robinson v. Estate of Robinson*, 2016 Ark. App. 130, 485 S.W.3d 261 (where will's proponent had burden of proof, or of going forward with proof, beyond a reasonable doubt, question on appeal is not whether this court has such a doubt but whether the trial court's decision was clearly erroneous).

### V.    *Discussion*

### A.    Active Efforts

Holmes argues that, while the Juvenile Code requires *reasonable* efforts, the ICWA requires *active* efforts, which she asserts involves a higher standard of proof. Holmes states that there is no dispute that she entered drug-treatment facilities multiple times but contends that she only left due to health concerns. She maintains that the services offered by DHS were "menial and average" and that even the trial court acknowledged that more could have been done.[5]

Although expert testimony was not necessary, Allison specifically testified that DHS had made active efforts under the ICWA to prevent the breakup of an Indian family. She said that multiple referrals for drug treatment amounted to "active efforts" and that those efforts had proved unsuccessful when Holmes did not stay long enough at any facility to complete drug treatment. There was no dispute that Holmes had health issues that could

---

[5]Despite any comments from the bench, the trial court repeatedly found in its orders that active efforts had been made by DHS.

have affected her ability to complete treatment. The trial court specifically found that "Ms. Holmes did have medical issues that contributed to the delay in her resolving her substance abuse issues but those should not have interfered with completion of treatment for 30 days in the last year." In addition to the multiple referrals for drug treatment, Holmes was ordered to complete counseling to address both her substance-abuse issues and the sexual-abuse allegations. Holmes, however, was dropped from counseling because she had missed several appointments. We cannot say that the trial court clearly erred in determining that DHS proved beyond a reasonable doubt that active efforts were made.

### B.    Serious Damage

Holmes argues that she was diligent in her attempts to complete drug treatment but that her efforts were thwarted by her recurring health issues. Holmes maintains that, although there was a true finding of sexual abuse against John, it was only an allegation. She also points out that she had stable housing and income before the case had begun while she was with her husband. Holmes states that these issues do not rise to the level of required proof of damage.

Allison specifically testified as an expert that Holmes's continued custody of the children was likely to result in serious emotional or physical damage to them. The biggest concern was Holmes's use of drugs and failure to take advantage of the many referrals for drug treatment from DHS over the course of more than a year. Moreover, Holmes denied having any substance-abuse problem at the termination hearing. Also of concern was the fact that an agency had made a true finding of sexual abuse against John. Holmes failed to complete counseling, which would have helped her gain insight into how to protect

K.M.H. from further abuse. Although Holmes asserted that she would protect K.M.H., she also said that she did not know whether K.M.H. had been sexually abused; she disobeyed a court order that her children were to have no contact with John; and she had attempted to reconcile with John, was still married to him as of the termination hearing, and testified that she was unsure of her future plans for their relationship. We do not disagree that John provided Holmes and the children stability with respect to housing and income, but we cannot overlook the true finding of sexual abuse against John notwithstanding the absence of criminal charges. We hold that the trial court did not clearly err in determining that DHS proved beyond a reasonable doubt that Holmes's continued custody was likely to result in serious emotional or physical damage to the children.

Affirmed.

GLADWIN, C.J., and GLOVER, J., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor children.