Cite as 2021 Ark. App. 118

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-20-592

|  |  |
|---|---|
| ROSIE GARRIS AND CHRISTOPHER SHADWICK | **Opinion Delivered** March 10, 2021 |
| APPELLANTS | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FJV-17-397] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE LEIGH ZUERKER, JUDGE |
| APPELLEES | AFFIRMED |

## LARRY D. VAUGHT, Judge

Rosie Garris and Christopher Shadwick each appeal the Sebastian County Circuit Court's order terminating their parental rights to their child, CG. They claim that the circuit court failed to comply with the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq. (2018), which is incorporated into the Arkansas Juvenile Code. Ark. Code Ann. § 9-27-325(h)(2)(B) (2019). We affirm.

On September 14, 2017, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect against Rosie after it placed an emergency hold on Rosie's seven-year-old daughter, CG, because CG disclosed sexual abuse by her father, Christopher. In an investigation conducted by DHS, Rosie admitted that she knew Christopher was a registered sex offender and knew about the child's sexual-abuse

allegations against him but stated that she did not believe the allegations were true and would continue her relationship with him after he was released from jail.

The circuit court entered an ex parte order for emergency custody. It entered a probable-cause order on October 30, 2017, in which it found that CG should remain in foster care. The court then held an adjudication hearing and entered an order on December 11 adjudicating CG dependent-neglected due to Rosie's stipulation to parental unfitness. In that order, the court noted that Rosie believed she might be eligible for membership in an Indian tribe but that she had "failed to provide sufficient information"; therefore, the court declined to apply the ICWA. At that time, DHS also filed a motion to join Christopher as a necessary party, and the court adjudicated him to be CG's parent. Christopher was added as a defendant in the case, and both parties were ordered to participate in services and work the case plan. Because Christopher was incarcerated, he was ordered to participate in any family services available to him in prison during the length of his incarceration. The court also issued a no-contact order between Christopher and CG. On April 4, 2018, Christopher entered a guilty plea to charges related to his rape of a young girl (not CG) and was sentenced to three hundred months (twenty-five years) in the Arkansas Department of Correction (ADC) plus 180 months' suspended imposition of sentence.

Over the course of the following two years, DHS worked with both Rosie and CG in order to help Rosie provide a safe home for CG. On April 1, 2019, the court allowed CG to be returned to Rosie for a trial home placement. The court ordered that no men were permitted in the home when CG was present. The case remained open, and DHS filed a petition for emergency change of custody one month later after CG disclosed to the attorney

ad litem that men were living in the home. Rosie denied this, and the court allowed the trial home placement to continue. On October 17, the court granted Rosie legal custody of CG but kept the case open. On November 6, DHS removed CG from Rosie's home again when it was discovered that Rosie and CG had been living with a registered sex offender named Benjamin Webster and that Rosie had been arrested for harboring a fugitive. In the affidavit attached to the petition for emergency custody, DHS noted for the first time that Rosie was an enrolled member of the Muscogee Creek Nation. At the time, the court also found that because Christopher was incarcerated and is a registered sex offender, he was not an appropriate parent for placement or visitation. The previous no-contact order remained in place.

On January 2, 2020, the circuit court held an adjudication hearing during which it certified Mindy Tuck-Duty as an expert witness for DHS regarding the Muscogee Creek Nation for ICWA purposes. The circuit court found that CG was dependent-neglected based on parental neglect and unfitness. The court further found that DHS had made reasonable and active efforts to prevent the breakup of the Indian family and that the parents' continued custody of CG would result in serious emotional and physical damage to her. Additionally, the circuit court noted that it had specifically warned Rosie about her disregard for court orders and her poor judgment, and despite these warnings, she continued to put CG at risk. The circuit court ordered that the goal of the case should remain reunification, but it added a concurrent goal of adoption.

As for Christopher, the court found that he was not an appropriate option for placement of CG due to his incarceration and his status as a registered sex offender. The court

3

again ordered that there be no contact between Christopher and CG. Further, the court noted that it had become aware that letters had been exchanged between Christopher and CG in violation of the no-contact order, and it ordered the parties to provide copies of these letters to DHS.

DHS filed petitions to terminate both parents' parental rights on March 27, 2020. On April 30, the circuit court held a review hearing and noted that Christopher appeared with an appointed attorney. At this hearing, the circuit court continued the concurrent goals of reunification and adoption and kept the no-contact order in place. Additionally, the circuit court noted that Rosie had housing but that it was unclear whether she was living with a boyfriend, and it found that Rosie had not provided proof of employment and had attended only one counseling session since January 15, 2020.

The court conducted a termination hearing that began on June 4 and continued to June 26, 2020. At the termination hearing, Christopher testified that he has been incarcerated for three years for the rape of a young girl (not CG). He stated that he anticipates having approximately fourteen years left to serve on his sentence and that CG will be approximately twenty-four years old when he is released. He said he believes he can have contact with a minor so long as it is his child and not his victim. He testified that he would like to see CG placed with her mother, Rosie. He said he would also be able to have contact with CG during his incarceration. Christopher testified that he had not been instructed by DHS to participate in any services, but he had completed many programs while incarcerated including anger-management classes, parenting classes, communication skills, stress-management groups, thinking errors, one year of attendance at Alcoholics Anonymous, and a substance-abuse-

education course. He said that he continues to participate in a program called Celebrate Recovery, which is a faith-based rehabilitation program. He testified that he is in a life-skills course in prison and trying to get transferred to another unit so he can take college courses. Christopher testified that although he knew the court had ordered no contact with CG, he had not received a paper copy of that court order.

Bailey Murray, the caseworker, testified that DHS became aware of letters being exchanged between Christopher and Rosie or CG in violation of the no-contact order. Murray stated that the parties had not asked permission to communicate and that DHS had not approved any contact through letters or otherwise. She stated that the content of the letters was not inappropriate.

Murray noted that Christopher had not been released from incarceration at any time during this case, and he had not been referred for any type of services due to his incarceration and the no-contact order. She stated that she had never inquired of ADC if domestic-violence education, a sex-offender assessment, or any other type of sexual-abuse services could be provided to Christopher.

Mendy Tuck-Duty again testified as an ICWA expert. She stated that she is a member of the Cherokee Nation and the Choctaw Nation, though not a member of the Muscogee Creek Nation. She testified that she is familiar with the tribal customs, rituals, and history of the Muscogee Creek Nation. During Tuck-Duty's testimony, she admitted that she is the Arkansas Department of Child and Family Services (DCFS) supervisor for Sebastian County; however, she stated that she was not assigned to CG's case and had not supervised any DHS employee assigned to the case. Tuck-Duty testified that she believes DHS made active efforts

to preserve the Indian family, specifically as to the services provided to Rosie, the Indian parent. She also testified that there would be a risk of harm in returning CG to Rosie's custody because Rosie had repeatedly failed to protect CG in the past and had continued to allow sex offenders near her daughter during the pendency of the case. Tuck-Duty also testified that she believes there is a risk of harm in placing CG with Christopher due to his criminal history and incarceration. Tuck-Duty stated that representatives from the Cherokee Nation and Muscogee Creek Nation had informed her that there were no available placements for CG within those tribes. When asked whether she had been able to discuss the specifics of this case with a representative from Muscogee Creek Nation, she stated that she had only spoken with the staff member assigned to handle placement issues and that she had been unable to reach the Muscogee Creek Nation caseworker assigned to CG's case despite having left multiple messages.

Christopher testified that he wrote letters to Rosie because she was the only person he could contact who would write him back. He stated that, to his knowledge, the only time DHS contacted the ADC about him was to inquire about the letters. He stated that he had written letters to DHS supervisors and caseworkers and never received anything back. He said that he had requested visitation with CG and had requested copies of the case plan but had received neither. He also testified that no one came to pick him up for several court hearings and that he had not been allowed to participate in those hearings via video. He stated that, even when he was physically in the courtroom, he had no communication with the caseworker and never received any documents at that time. He went on to explain that the ADC offers an "RSVP

6

Program," which is a sex-offender treatment program, which he said he could enroll in immediately if it were court ordered.

In an order filed on July 24, 2020, the court terminated both Christopher's and Rosie's parental rights. It found that Christopher's rights should be terminated based on the statutory ground codified at Arkansas Code Annotated section 9-27-341(b)(3)(B)(viii) (Supp. 2019), which applies when "[t]he parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile's life." The circuit court terminated Rosie's parental rights on the basis of its findings that she failed to remedy the conditions necessitating the child's removal from her custody, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*; that other "subsequent-factors" arose after CG was removed from Rosie's custody that demonstrate that placement of CG with Rosie would be contrary to CG's health, safety, or welfare, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii); and that Rosie subjected CG to "aggravated circumstances" and there is little likelihood that further services would result in reunification, Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)–(B)(i)*. The circuit court further found by clear and convincing evidence and beyond a reasonable doubt that CG is adoptable, that return of CG to the parents' custody would likely result in potential harm, and that continuing contact with the parents would likely result in serious physical or emotional damage to CG. Additionally, the circuit court found that DHS had made reasonable and active efforts in this case to prevent the breakup of the Indian family. Both parents now appeal.

A circuit court's order terminating parental rights in a case governed by the ICWA must be supported by proof beyond a reasonable doubt. *Holmes v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 495, at 9, 505 S.W.3d 730, 735; Ark. Code Ann. § 9-27-325(h)(3)(B) (Supp. 2019).

7

While the burden of proof in ICWA cases mirrors that in criminal proceedings, the standard of review does not. As we have previously clarified in other ICWA cases, this court's review of termination proceedings is de novo, and we will not reverse the circuit court's findings of fact unless they are clearly erroneous. *Holmes*, 2016 Ark. App. 495, at 9, 505 S.W.3d at 35–36; *Timmons v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 419, 376 S.W.3d 466.

Both parents raise challenges related to the ICWA. Rosie challenges the court's decision to allow Tuck-Duty to testify as an ICWA expert despite the fact that she is not a member of the Muscogee Creek Nation and is a DCFS employee. She also challenges the sufficiency of the evidence supporting the court's risk-of-harm findings. Christopher challenges the court's active-efforts finding.

The ICWA requires testimony from a qualified expert witness to support the termination findings. 25 U.S.C. § 1912(f). The Code of Federal Regulations provides guidance on what qualifies a witness as an ICWA expert:

> (a) A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.

> (b) The court or any party may request the assistance of the Indian child's Tribe or the BIA office serving the Indian child's Tribe in locating persons qualified to serve as expert witnesses.

> (c) The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child.

25 C.F.R. § 23.122 (2020). Additionally, "[w]hether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and [an appellate court] will not

reverse such a decision absent an abuse of that discretion." *Graftenreed v. Seabaugh*, 100 Ark. App. 364, 372, 268 S.W.3d 905, 916 (2007). In *Graftenreed*, we explained that absolute expertise is not required and that an expert witness may rely on information provided by others in forming his or her opinions. *Id.* The Federal Register specifically addresses this issue:

> The final rule does not require that the qualified expert witness be a citizen of the Tribe. The witness should be able to demonstrate knowledge of the prevailing social and cultural standards of the Indian child's Tribe or be designated by a Tribe as having such knowledge.

81 Fed. Reg. 38778, 38831–32 (June 14, 2016) (to be codified at 25 C.F.R. § 23.122(a), (b)).

The regulation is written in the permissive and specifically states that the Indian child's tribe *may* designate the expert in the case. 25 C.F.R. § 23.122(a). Therefore, the rule is intended to provide the tribe the option of designating an expert, but it does not mandate that it do so. Furthermore, the rule neither prevents DHS from designating its own expert witness when the tribe fails to do so nor requires that such a witness be a member of the tribe. Therefore, we find no merit in Rosie's argument that Tuck-Duty was ineligible to serve as an ICWA expert witness in this case because she is not a member of the Muscogee Creek Nation.

In a related argument, Rosie argues that Tuck-Duty failed to testify to any specific knowledge about Muscogee Creek Nation rituals and customs. We cannot reach the merits of this argument because Rosie failed to preserve it at the termination hearing. While she objected to Tuck-Duty's qualification as an expert witness, she did so explicitly on the basis that Tuck-Duty is not a member of the Muscogee Creek Nation, and she did not include in her objection any argument about the lack of specific testimony regarding Tuck-Duty's knowledge of the tribe's rituals and customs. In *Johnson v. Arkansas Department of Human Services*, we rejected an appellant's argument that challenges to the qualification of an ICWA expert witness are

sufficiency-of-the-evidence issues that do not require preservation rather than evidentiary issues that do require preservation. 2016 Ark. App. 49, at 4–5, 481 S.W.3d at 465–66 (citing *Philpott v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 572, at 6). Here, Rosie's argument that Tuck-Duty did not demonstrate the level of familiarity with Muscogee Creek Nation customs and rituals necessary to qualify her as an expert witness is an evidentiary challenge that must be preserved in order to be raised on appeal. Because Rosie failed to raise this issue before the circuit court, we are barred from considering it.

Rosie also argues that Tuck-Duty failed to personally meet with Rosie and CG. As with her previous argument, she did not raise this as part of her objection below, and to the extent that it is a challenge to Tuck-Duty's qualifications as an expert witness, it is not preserved. To the extent that Rosie's argument can be characterized as a challenge to the sufficiency of the evidence against her, it lacks merit. She has provided no authority for her position that an ICWA expert witness's opinions must be based on personal interactions with the parents or children at issue in the case. As stated above, we explained in *Graftenreed* that an expert witness may rely on information provided by others in forming his or her expert opinions. 100 Ark. App. at 371, 268 S.W.3d at 914. Rosie's assertion that Tuck-Duty lacked a sufficient factual basis for her expert opinions is a factor that the circuit court, sitting as fact-finder, could consider when choosing how much weight and credibility to give her testimony. We must give due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Bolden v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 218, at 7, 547 S.W.3d 129, 133–34. This court will not act as a "super factfinder," substituting our own judgment or second-guessing the credibility determinations of the circuit court. *Id.*; *Harris v. Ark. Dep't of Human Servs.*, 2015

10

Ark. App. 508, at 7, 470 S.W.3d 316, 320. Rosie also argues that Tuck-Duty should have been disqualified as an ICWA expert witness because she serves as a DCFS supervisor, which Rosie claims is a conflict of interest. DHS argues that Tuck-Duty was eligible under the applicable regulations because she did not work on CG's case and did not supervise caseworkers who handled the case. As with Rosie's previous argument, to the extent that she frames this issue as an evidentiary challenge to Tuck-Duty's qualification as an expert witness, her argument has not been preserved for our review because she failed to raise it below. To the extent that Rosie is challenging Tuck-Duty's credibility due to her employment with DCFS, we must again give deference to the opportunity of the circuit court to judge the credibility of witnesses.

Rosie also contends that, based on the errors alleged above, DHS failed to meet the statutory requirements for termination pursuant to the ICWA and that, therefore, CG's permanency is at risk because she cannot be adopted. In support of this argument, Rosie cites several cases from other jurisdictions in which an adoption proceeding following a termination order governed by the ICWA was disrupted because the prior termination proceeding was found to have not complied with the ICWA. Rosie's argument fails because she asserts no additional allegations of reversible error than those already addressed and rejected above. Because we have found no reversible error as to any of Rosie's previous points on appeal, this argument lacks merit.

In addition to the evidentiary challenges to Tuck-Duty's qualification as an expert witness, Rosie also challenges the sufficiency of the evidence supporting the court's finding that returning CG to her custody would likely result in serious physical or emotional damage to CG. Under the ICWA,

11

[n]o termination of parental rights may be ordered in the absence of a determination, supported by evidence beyond a reasonable doubt, including the testimony of qualified expert witnesses, that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

*Allen v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 608, at 7, 377 S.W.3d 491, 496 (citing 25 U.S.C. § 1912(f)).

Rosie argues that Tuck-Duty, as the ICWA expert, did not specifically testify that CG would likely suffer serious physical or emotional damage if returned to her custody. Rosie's argument misses the mark because it focuses on whether Tuck-Duty used the exact language of the statute. The question is not whether the ICWA expert witness used any magic words in describing the risk posed by returning the child to the parent but whether the court had sufficient evidence including, but not limited to, Tuck-Duty's testimony to support such a finding.

Here, the court's finding that returning CG to Rosie's custody would likely result in serious emotional or physical damage to CG was supported by sufficient evidence. Rosie has a history of failing to protect CG from sexual abuse. She refused to believe CG's reports of abuse against Christopher, and she continued to place CG in harm's way when she regained temporary custody. Rosie chose to continue to allow sex offenders to be around CG despite being ordered by the court not to have any men in the home. She also harbored a fugitive in the presence of CG and then left her without a caregiver when Rosie was arrested. While Tuck-Duty did not use the magic words listed in the statute, she did testify to the risk of harm she believed CG would face if returned to Rosie's custody. DHS presented evidence to support Tuck-Duty's opinion. We find no reversible error on this point, and we therefore affirm the termination of Rosie's parental rights to CG.

Christopher's only argument on appeal is that the circuit court erred in finding that DHS had provided "active efforts" to achieve reunification. Under the ICWA,

> [a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d). Here, DHS contends that providing services to Christopher was not feasible due to his incarceration and the court's no-contact order. In its brief, DHS concedes that Tuck-Duty's testimony regarding DHS's "active efforts" to prevent the breakup of the Indian family was related solely to services provided to the "Indian parent," meaning Rosie. Christopher argues that DHS failed to comply with the ICWA's "active efforts" standard because such services were not provided to him.

In evaluating his claim, we first note that the statutory ground on which Christopher's parental rights were terminated did not required DHS to prove that it had provided him with any services. Pursuant to the subsection applicable to Christopher, DHS was required to prove only that the parent was sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the child's life. Ark. Code Ann. § 9-27-341(b)(3)(B)(viii). We have previously held that, unlike the requirements for termination under other grounds, "[t]he incarceration ground does not require DHS to provide services to a parent while he is in prison as a prerequisite to termination or to contemplate what it will do when the parent is released." *Woodward v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 91, at 6, 513 S.W.3d 284, 288. Christopher does not challenge the existence of statutory grounds for termination. Instead, he now argues that although the Arkansas Juvenile Code does not require DHS to provide

reunification services to an incarcerated parent in this context, the ICWA's "active efforts" standard imposes such a requirement. We disagree.

DHS cites numerous cases from other jurisdictions for the position that a parent's incarceration may drastically reduce the "efforts" that are available to DHS in an ICWA case and that, in lieu of providing services to an incarcerated parent, DHS may meet its statutory obligation by providing services to the parent who is not incarcerated. *D.J. v. P.C.*, 36 P.3d 663, 673 (Alaska 2001); *Dashiell v. State*, 222 P.3d 841, 849–50 (Alaska 2009); *People ex rel. S.H.E.*, 824 N.W.2d 420, 427–28 (S.D. 2012) (per curiam). We need not and do not rely on such cases in deciding this issue, however, because a plain reading of the statute reveals that the ICWA's "active efforts" standard is not an individual right that accrues to the benefit of a particular parent but is instead focused on preservation of the family unit to the extent possible. The ICWA directs DHS to work toward preserving the Indian family, which DHS did in this case by providing services to Rosie. Throughout the case, the court found that Christopher's prison sentence, his history of sexual abuse of young girls, and the no-contact order made him an unsuitable parent for placement or visitation. Therefore, DHS reasonably pursued the statutory goal of "preserving the Indian family" by providing extensive services and support to Rosie, who was the only parent in a position to regain custody of CG at any point during the pendency of the case.

We also reject Christopher's attempts to frame the same "active efforts" argument as a challenge to the sufficiency of the evidence supporting the court's best-interest findings. The court found that returning CG to Christopher's care would subject her to a substantial risk of harm and would result in serious physical and emotional damage to her. Christopher argues

14

that neither finding could be made without proof that DHS had provided active efforts to rehabilitate him and that those efforts failed. He cites no authority for this position, and we disagree. There was sufficient evidence to support the court's findings regarding potential harm to CG if returned to Christopher's custody: he was incarcerated and could not care for CG, he is a registered sex offender convicted of raping a young girl, CG reported that he sexually abused her, and he failed to comply with the court's no-contact order during the case. We therefore find no reversible error and affirm the termination of Christopher's parental rights to CG.

Affirmed.

GLADWIN and HIXSON, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for separate appellant Rosie Garris.

*Dusti Standridge*, for separate appellant Christopher Shadwick.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor child.