Cite as 2023 Ark. App. 323

# ARKANSAS COURT OF APPEALS

DIVISIONS III & IV
**No.** CV-22-666

|  |  |
|---|---|
| | **Opinion Delivered** May 31, 2023 |
| LESTER PERRY<br><br>APPELLANT | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT<br>[NO. 43JV-20-146] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | HONORABLE BARBARA ELMORE, JUDGE<br><br>REVERSED AND REMANDED |

### BART F. VIRDEN, Judge

Lester Perry appeals the circuit court's order terminating his parental rights to MC2, MC3, and MC4. We reverse and remand.

### I. *Background*

On October 1, 2020, the Arkansas Department of Human Services (DHS) received a report that Lester Perry and Tequila Rice were leaving their minor children in their rented room in a home with no supervision arrangements. The children involved were MC1 (female, born 2005); MC2 (male, born 2011); MC3 (female, born 2015); and MC4 (female, born 2019). During the investigation, the home's owner told DHS that Tequila repeatedly went out for indeterminate times and left MC2, MC3, and MC4 at the home, expecting him to watch the children but without consulting him. When interviewed, Lester told DHS he was working when this occurred, and he thought Tequila was watching the children. On November 2, 2020, DHS exercised a hold on all four children. MC1 was taken into custody that day, but DHS could not locate the younger children.

The affidavit accompanying the petition for ex parte emergency custody stated that Lester was found to be the parent of all four children in a prior foster-care case from 2015. The ex parte order entered on November 5, 2020, lists Lester as the "legal parent" of the four children. Lester and Tequila were appointed separate parent counsel, each being designated as a "parent or custodian from whom custody was removed."

At the probable-cause hearing, Lester was ordered to complete several services, including homemaker services, parenting classes, individual counseling, random drug screens, a drug-and-alcohol assessment, attend NA/AA meetings twice a week, and obtain a psychological evaluation. He was allowed supervised visits with the four children. Additionally, he was ordered to remain drug-free, follow the recommendations of any assessments, maintain stable housing and income, comply with the case plan, cooperate with DHS, maintain contact with DHS, and demonstrate improved parenting. At the January 5, 2021 adjudication hearing, the circuit court found that the children were dependent-neglected due to inadequate supervision. The goal of the case was set as reunification, with a concurrent goal of permanent custody with a family member. Both parents were allowed supervised visitation twice weekly with the children. Lester was also ordered to obtain a hair-follicle and nail-bed drug screen. At the review hearing on March 31, 2021, all prior services were continued. Lester's compliance was not addressed. The court "withheld" a reasonable-efforts finding regarding DHS's attempts to provide services to achieve the goals of the case. DHS was ordered to conduct random drug-and-alcohol screens at least twice a month, provide Lester with transportation to his psychological evaluation and drug-and-alcohol assessment, and visit the parents' home. Lester was not present for the August 4, 2021 review hearing, but his services remained the same. His compliance was not addressed. At that hearing, the circuit court adjudicated Lester to be

the father of MC2 and MC3, but DNA testing was ordered as to MC1 and MC4. Tequila's visitation was suspended until she "completes 3 services." At the November 23, 2021 permanency-planning hearing, the circuit court found Lester in compliance with the case plan and court orders such that he was making significant and measurable progress and diligently working towards reunification. The court found that Tequila was not complying with the case plan and court orders. The goal of the case changed to placement with a parent, guardian, or custodian. DHS was ordered to take Lester within the next twenty-four hours to have a hair-follicle and nail-bed drug test, complete a walk-through of Lester's home, and continue with drug-and-alcohol screens at least twice a month. If Lester was negative on his hair-follicle and nail-bed drug test, and if there was an approved walk-through of his home, a motion was to be submitted to facilitate a trial home placement. The record is silent as to whether DHS completed the court's directions from this hearing. A fifteen-month hearing was held on March 29, 2022. At this time, MC1's goal was changed to another planned-permanent-living arrangement ("APPLA"), with DHS ordered to work on an independent-living-services plan for her. The goal for MC2, MC3, and MC4 changed to adoption. The order noted that the younger children were placed with a relative; however, that relative was not interested in adoption, and the court found that pursuing termination of parental rights would be in the best interest of the juveniles. Lester was found to be in partial compliance with the case plan and court orders, and visitation remained as previously ordered.

On June 8, 2022, DHS and the attorney ad litem filed a joint termination-of-parental-rights petition regarding MC2, MC3, and MC4. The petition did not differentiate between the grounds that applied to Tequila and the grounds that applied to Lester. The grounds pled were as follows: twelve-month failure to remedy; twelve-month unable to place with a noncustodial parent; failure

3

to provide material support or maintain meaningful contact; other subsequent factors; abandonment; and aggravated circumstances, specifically, little likelihood of reunification. The petition contained several pages of allegations that were not reflected in the court's prior orders.

On July 5, 2022, Lester filed a motion for a trial home placement or, in the alternative, increased visitation. Lester argued in the motion that he was in full compliance with the case plan and court orders and that he had obtained a four-bedroom home appropriate for himself and the children. In the alternative, Lester argued that his compliance warranted an increase to unsupervised overnight or weekend visitation so he could show the ability to care for his children. Lester requested a hearing on the motion before the scheduled termination hearing. Attached to the motion was a copy of Lester's lease signed on May 24, 2022, and pictures of his apartment. A separate review hearing as to MC1 was held on July 6, 2022. The circuit court ordered that Lester and MC1 would have unsupervised visits two times a week from nine a.m. to five p.m. on Lester's days off from work. At no time during the visits was MC1 to have any contact with Tequila.

The termination hearing regarding MC2, MC3, and MC4 was held on July 28, 2022. Lester was present with counsel, but Tequila was not present. Family service worker ("FSW") Whitney Bradley testified that DHS recommended Lester's and Tequila's parental rights as to MC2, MC3, and MC4 be terminated. Whitney testified about how the case opened and said that the children were adjudicated dependent-neglected due to inadequate supervision. She testified that Lester had completed his psychological evaluation and that he had moved into a new apartment a month and a half before the termination hearing. She said she had not been able to do a walk-through of the new apartment, claiming communication issues with Lester and his work schedule hampered her efforts to visit the home. Whitney admitted that Lester had completed all the services in the case plan and

4

had been compliant for at least thirteen months. Whitney testified at length about a visit to Lester's former residence on May 5 during which she observed a person under a sheet on a bed in the front bedroom. Whitney testified that Lester would not tell her who the individual was; and despite never seeing the person's face or speaking to the person, Whitney was positive that the person was Tequila. Whitney also testified that at the staffings in February and June 2022, Lester stated he needed help from Tequila and did not understand why she could not be around the children. The incident on May 5 and Lester's statements at the staffings led Whitney to believe that if placed with Lester, the children would "possibly" be around Tequila. She believed that Tequila is mentally ill, and Lester "might not be able to protect his kids" from their mother. Whitney also believed that Lester was still involved with Tequila, who had shown violent behavior when she "busted out the door" at the DHS office. Whitney did not believe that Lester could take care of the children on his own because he had never had to do so in the past. Whitney testified that Lester's work schedule and lack of a driver's license hampered increased visitation and progress toward placement, as did his not having a large enough or appropriate home. Whitney acknowledged that at the beginning of the case, Lester tested positive for THC, but subsequent drug-and-alcohol screens were consistently negative. He also submitted to a hair-follicle test on November 24, 2021, as directed by the court at the permanency-planning hearing, that came back negative for all substances. A copy of the hair-follicle test results was introduced at that time. Whitney believed that Lester did not start to comply with the case plan and court orders until about eight months into the case. She also testified that she was not aware of any issues Lester had with his HUD application, despite admitting that she knew he submitted one application and that she then helped him with a second application in March. Whitney acknowledged that Lester never received an opportunity to show that, on his own, he would be able to care for his

5

children and keep them safe. She then denied ever seeing any pictures of Lester's new apartment. During later testimony, she admitted that she saw them at the hearing regarding MC1 earlier that month but explained she did not "physically have them in [her] hand." After reviewing the pictures, Whitney could not see anything that would be an issue with the home. She testified that Lester stated in a staffing that the person at his home on May 5 was one of Tequila's cousins. Other than the incident on May 5, Whitney did not have any reason to believe that Lester had been around Tequila or that they had any direct contact with each other. She admitted there were never any allegations that Tequila had abused any of the children. Whitney at first said Lester was ordered not to have contact with Tequila, which she later changed to "he knows that he's not supposed to have contact with her if he wants the kids back." Whitney testified that DHS recommended at a hearing earlier that month that MC1 have unsupervised visits with Lester, but DHS recommended termination for MC2, MC3, and MC4 because they are younger. She acknowledged that if rights were terminated, it would sever the younger children's relationship with MC1 and split up the siblings. Whitney still thought termination was in the younger children's best interest. She also believed the children are adoptable and that there are no barriers to an adoption.

Phillip Liddekee testified that he worked for DHS. He said he was with Whitney at the visit to Lester's home on May 5. He also observed a person in the bed but did not see the person's face. Phillip concluded that the person in the bed was Tequila due to "moaning and groaning and some twitching" that he claimed was identical to how Tequila groaned and moaned when she was mad and "animated vocally." He also claimed that he saw Tequila in the parking lot of Lester's apartment complex, but Phillip acknowledged that it was a large complex with numerous residents. Also, earlier in the case, he saw Tequila get into Lester's car while Lester was inside the DHS office having a visit

6

with the children. However, Phillip acknowledged that Tequila knew when the weekly visits would occur because the schedule had not changed. Phillip stated that, except for one court hearing, it had been over a year since he had any real contact with Tequila. He claimed to know all of both Lester's and Tequila's cousins, and on the basis of that knowledge, Phillip concluded that it was not Tequila's cousin at Lester's house on May 5. Phillip stated that Lester had done everything asked of him, and Lester is a "good father" who brought his children presents and food to every visit. He stated that DHS wanted to terminate parental rights because Tequila is unpredictable, and DHS did not believe that Lester had stayed away from her.

The foster parent testified that MC2, MC3, and MC4 had been in her home for over a year, and they were doing well. She wished to adopt the children.

Lester then testified. He said that when the case opened, he was not aware that Tequila was leaving the children with their landlord because he was working when this would occur. Lester acknowledged that the home at that time was not appropriate, but around a month after the children had been taken into DHS's custody, he found a three-bedroom trailer. Lester said there were multiple FSWs throughout the case, and one of the FSWs came out to the trailer and told him it was not adequate. Lester said he moved into a four-bedroom apartment about two months prior to the termination hearing after being on a waiting list for HUD housing for approximately eight months. He said he separated from Tequila around the time of the adjudication hearing, and they had not lived together since their separation. A copy of the lease and pictures of the apartment were introduced into evidence. He testified that the apartment is set up and ready for the children to come home that day. Lester said he had constant contact with MC1, and he saw her almost every day at work. He said getting transportation set up was the main impediment to her having unsupervised visits at his

7

home.  He testified that he had worked for over twenty years at McDonald's, beginning when he was seventeen years old.  Lester said he is able to support himself and the children with his income, and he would apply for government assistance if needed.  He admitted he needed to get his driver's license reinstated, and he still owed about $700 in fines.  He said he had paid approximately $1300 on his fines, which he paid on a regular basis since this case opened.  Lester testified that there is an affordable taxi service he could use in Jacksonville and that the grocery store is within walking distance of his home. He knew which schools the children would attend if placed with him, and he was already on the wait list for daycare and after-school care.  Lester submitted additional job applications at the apartment complex where he lived and at a nursing home; however, he testified that he has job stability at McDonald's. Lester admitted he used marijuana at the start of the case but that he had last used marijuana over a year ago.  He still attended NA/AA meetings and produced sign-in sheets that were introduced as an exhibit. His last positive drug screen was around Mother's Day in 2021. Lester testified that it was difficult to start services because, at the beginning of the case, he was living in Lonoke, while his classes and services were in other places such as Jacksonville, Cabot, and Little Rock.  He explained that he missed the first appointment for his psychological evaluation because he did not have transportation.  Lester stated that there is nothing going on between him and Tequila.  He had not heard from her and did not know where she was living.  He did not believe Tequila knew where he lived because he had only told three or four people that he moved.  He did not have a working number for Tequila, and she had not shown up where he works. The last time Lester saw her was when she showed up at a visitation and entered his car.  His intent was to keep Tequila from having contact with the children, in part, because she had not done anything requested by DHS. Lester said his statements at the staffings that Whitney referred to in her

testimony, were intended to express how he did not understand why Tequila would not "step up" and do what she needed to do to participate in raising their children. He said it aggravates him that she had not participated in the case. According to Lester, the person at his home on May 5 was Tequila's cousin, Octavia, whom he had not seen since that day. Lester asked for an opportunity to show that he is able to care for his children and keep them safe. He said he is willing to do "whatever it takes," and if Tequila showed up, he would call the police. He acknowledged that Tequila has mental-health problems, but he stated that she had never hit or hurt any of their children. He did not think that it was in his younger children's best interest for his rights to be terminated and for their relationship with MC1 to be permanently severed. Lester knows his children are "great" and well behaved, and he would do anything for them. He brought Christmas presents for the children and brought food and other items to the visits. Lester acknowledged that there a prior DHS foster-care case that started in 2015 and lasted approximately a year when MC3 was born with drugs in her system. He admitted that at the time of the hold in the current case, MC1 was living with a twenty-two-year-old man. He admitted that there was a time when Tequila called during a visit, and he let her talk to the children. Lester was never asked to pay child support, and DHS had not asked him to provide any specific items for the children.

After all parties gave their closing statements, the court ruled from the bench that it was granting the termination petition. An order reflecting the ruling was entered on August 5, 2022. The court specifically found Lester's testimony not credible while finding that the testimony of Whitney Bradley, Phillip Liddekee, and the foster mother was credible. The court terminated both Lester's and Tequila's rights on the grounds of twelve-month failure to remedy conditions that caused removal and other subsequent factors. Regarding Lester specifically, the court found that

[Lester] has not internalized the services that he has received. The testimony from the caseworker and program assistant establishes that [Lester] has continued a relationship with [Tequila] and wants her to be a part of the children's lives. It is clear to the Court that [Lester] does not understand why [Tequila] cannot be around the children and he would not protect the children from her. The Court finds that his testimony today is not credible.

It also stated, "[T]he parents continue to be unstable and parental fitness continues to be a concern."

Lester appealed from the termination decision.

## II. *Standard of Review*

We review termination-of-parental-rights cases de novo. *Hune v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 543. We will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Holmes v. Ark. Dep't. of Hum. Servs.*, 2016 Ark. App. 495, 505 S.W.3d 730. To terminate parental rights, the court must find the existence of at least one statutory ground and that it is in the child's best interest to terminate. Ark. Code Ann. § 9-27-341 (Supp. 2021); *Kohlman v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595. A best-interest finding under the Arkansas Juvenile Code must include consideration of two factors: the likelihood of adoption and potential harm. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). Potential harm must be viewed in a forward-looking manner and in broad terms. *Riggs v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 185, at 5–6, 575 S.W.3d 129, 132.

## III. *Discussion*

### A. Paternity of MC4

On appeal, Lester argues that the circuit court erred in terminating his parental rights to MC4 because he was never legally found to be her parent. We agree. Pursuant to Ark. Code Ann. § 9-27-303(41) (Supp. 2021), "parent" means:

(A) A biological mother;

(B) An adoptive parent; or

(C) A man:

(i) To whom the biological mother was married at the time of conception or birth;

(ii) Who has signed an acknowledgment of paternity pursuant to § 9-10-120;

(iii) Who has been found by a court of competent jurisdiction to be the biological father of the juvenile or to have otherwise established paternity; or

(iv) Who is listed as the parent on the birth certificate of the child.

There is no evidence in the record involving Lester regarding MC4 that satisfies any of those statutory requirements. The initial finding that he was a "parent" relied on paternity established in a prior DHS case that occurred before MC4 was born. A DNA test was ordered for Lester regarding MC4, but the results are not in the record. At the termination hearing, the circuit court stated, "Now, the Court did order that a DNA on [MC4] be done. She's part of this case. As far as I know there was never any DNA, but there has been significant contact. I do find that he was a father of [MC4] with the significant contact that he's had." However, this finding was not reduced to writing or contained in the termination order. It is essential that an order be entered finding a person to be a parent as defined in section 9-27-303 (41) in order to terminate the person's parental rights; acquiescence by the "father" is not sufficient. *Campos v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 221, 644 S.W.3d 465; *Earls v. Ark. Dep't of Hum. Servs.*, 2017 Ark. 171, 518 S.W.3d 81. Lester was adjudicated the father of MC2 and MC3, so his being named as "father" in pleadings and his receiving parent counsel is not determinative of the issue regarding MC4. Therefore, the circuit court clearly erred in terminating Lester's parental rights to MC4 because his parental status regarding MC4 had not been sufficiently established.

### B. Statutory Grounds

Next, Lester argues that there was insufficient evidence for the circuit court to terminate his parental rights to MC2 and MC3. Numerous grounds were jointly pled against Lester and Tequila,

but the circuit court made findings only with regard to twelve-month failure to remedy conditions that caused removal and other subsequent factors.

Lester was identified in initial pleadings as being a parent from whom custody was removed. Termination on the "failure to remedy" ground requires:

> (i)*(a)* That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*. The termination order does not indicate which conditions that caused removal Lester had not remedied. The adjudication order made no findings as to whether or how much each parent contributed to the inadequate supervision or if Lester was even aware that Tequila was leaving the children unsupervised. DHS and the attorney ad litem argue in their brief that Lester's housing was "unstable," but the evidence in the record shows that each housing stop was an improvement. Lester admitted that the original one-bedroom arrangement was not suitable. He then found a trailer, which he said a caseworker had deemed insufficient. From the record, it appears his next stop was the four-bedroom apartment. DHS had not done a walk-through, but the FSW testified she had made only two phone contacts to try to set it up, despite knowing that the termination hearing was imminent. The circuit court generally found Lester's testimony to be not credible, but nothing in the record disputes his testimony that he had filled out paperwork with HUD eight months prior to receiving the four-bedroom home. In fact, Whitney testified that she knew he had previously filled out a HUD application on his own, and she helped him with a second one the following March. There was no evidence in the record to indicate that Lester had turned down other appropriate housing during the course of this case.

Further, Lester had taken steps for appropriate childcare if the children were returned to his custody. Lester knew where the children would be enrolled in school, and he was on a waitlist for daycare and after-school care. MC2 and MC3 were elementary-school aged at the time of the termination hearing. Lester had been employed by McDonald's for many years, and he remained employed throughout the case. There are no allegations that his employment was unsuitable or that he would be unable to provide for the children. MC1 was authorized to have unsupervised visitation with Lester in her portion of the case, so there were no environmental or physical conditions that would indicate a general lack of safety in the home. There is likewise no explanation or support for the circuit court's finding of continued instability and parental unfitness that would support termination of Lester's parental rights on this ground.

To terminate parental rights on the "other subsequent factors" ground, the following must be proved:

> (vii)*(a)* That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*. Lester completed the case plan, per testimony from the caseworker. He remained employed, visited the children regularly (and brought them food and gifts each time he did), and had even been granted unsupervised visitation with MC1. His drug use was no longer an issue. The circuit court made the following oral statements regarding this ground for the first time at the termination hearing:

13

The --subsequent to the petition was the anger of [Tequila] and the fact that [Lester] was not able to keep her away, not even during visits. And then allowing her to talk to the children while he's at visits on his phone. He does not understand the gravity of the issue.

However, "subdivision (b)(3)(B)(vii)*(a)* of this section [other subsequent factors] does not apply if the factors or issues have not been adjudicated by the court or the parent is not provided with proper notice of the factors or issues." Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(d)*. While Tequila's visitation with the children was suspended at one point, there is no indication in the record that Lester was ordered to not have contact with her. All of the testimony of Lester's alleged continued contact with Tequila, even if taken as true, shows that his contact occurred when the children were not around. There was no time frame given for when Tequila entered Lester's car at the DHS office after a visitation or for when Lester allowed Tequila to talk to the children during a visitation that was allegedly supervised by DHS personnel. Phillip's testimony about seeing Tequila in the parking lot of Lester's apartment complex was very vague and without relation to proximity to Lester's apartment itself. Most importantly, however, there is no evidence in the record that Lester was told to not have contact with Tequila or to not let her have any contact with the children. Lester cites *Duncan v. Arkansas Department of Human Services*, 2014 Ark. App. 489, to argue that termination based on speculation of continued contact is clearly erroneous. We agree. While there was testimony that Tequila destroyed property at a DHS office, there was no testimony that she had ever physically harmed the children, Lester, or anyone else. Property damage alone might be sufficient justification to order discontinuing contact, but there must be actual proof—not just allegations in the termination petition—that Lester was advised to sever contact with Tequila, and failed to do so, for the circuit court to terminate on this ground for this reason.

14

A blanket finding by the circuit court that Lester's testimony was not credible cannot fulfill the standard of review. Allegations in a termination petition do not, in and of themselves, rise to the level of proven facts to support termination grounds. We defer to the circuit court on matters of credibility. *Bradbury v. Ark. Dep't of Hum. Servs.*, 2012 Ark. App. 680, at 7, 424 S.W.3d 896, 900. But we must also balance that deference with the due-process rights of the parent. The orders in the record contained sparse details. There was no documentation of Lester's progress or compliance from the time of removal until the November 23, 2021 permanency-planning hearing when the court found he was making significant, measurable progress and that he was working diligently to complete the goals of the case. At the March 29, 2022 fifteen-month hearing, he was found to be in "partial compliance," but the record does not indicate what changed over those four months. In the absence of actual proof of other subsequent factors—along with indifference to remedying them— termination is clearly erroneous. Credibility findings alone are insufficient.

> "Credibility describes a quality of the witness (the quality of being believable or trustworthy, not an independent fact or circumstance)." We went on to say, "[s]tated more plainly, we defer to a circuit court's credibility determinations, but those determinations must relate to testimony or evidence regarding material facts" in order to support the circuit court's findings. *Geren Williams* [*v. Green*], 2015 Ark. App. 197, at 15–16, 458 S.W.3d 759, 769. As in *Geren Williams*, we hold that the circuit court erroneously substituted its credibility determination for substantive evidence sufficient to support its finding.

*Guthrey v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 19, at 8–9, 510 S.W.3d 793, 798 (reversing a termination where, despite the circuit court finding mother's testimony was self-serving and not credible, there was insufficient evidence to support the termination grounds pled). Also squarely on point is *Mason v. Arkansas Department of Human Services*, 2022 Ark. App. 124, 642 S.W.3d 260, which was recently applied in *Richie v. Arkansas Department of Human Services*, 2023 Ark. App. 219. In *Richie*,

this court reversed an order terminating a father's parental rights that was based largely on credibility findings, despite proof of compliance, progress, and a bond between the father and his children. We therefore rely on *Mason* and *Richie* in reversing the termination of Lester's parental rights regarding MC2 and MC3.

Because we reverse the termination decision on the basis of the statutory-grounds issue, we need not address Lester's best-interest challenge at this time. *Tovias v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 228, 575 S.W.3d 621.

Reversed and remanded.

ABRAMSON, GLADWIN, and THYER, JJ., agree.

GRUBER and BROWN, JJ., dissent.

**WAYMOND M. BROWN, Judge, dissenting**. I agree with the majority's finding that the circuit court erred in terminating Perry's parental rights to MC4 because Perry was never found to be MC4's "parent" as required under the Arkansas Juvenile Code. However, the majority and I part ways in the analysis of the termination of Perry's parental rights to MC2 and MC3. While the majority holds that the circuit court erroneously terminated Perry's parental rights to MC2 and MC3 because it was based exclusively on speculation and credibility determinations, I would hold that the evidence sufficiently chins the bar outlined in the applicable standard of review.

As discussed in the majority opinion, the circuit court terminated Perry's parental rights on two grounds: failure to remedy and subsequent factors. Under the subsequent-factors ground, the court may terminate parental rights if subsequent to the filing of the original petition for dependency-neglect, other factors arose that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare, and despite the offer of appropriate family

services, the parent manifests the incapacity or indifference to remedy the subsequent factors or rehabilitate the parent's circumstances that prevent placement with the parent.[1]

Perry contends that while the children were out of his custody for over twelve months, the evidence demonstrated that he completed all services provided by the Arkansas Department of Human Services (DHS) and was in compliance with the case plan and court orders. He asserts that he maintained stable employment throughout the case, obtained a home appropriate for his children, and attended visitations. Perry argues that "[t]he barrier to placement with [him] and what ultimately led the court to terminate his parental rights was the belief that he was still in a relationship with Tequila." He asserts that this "belief" was based on speculation stemming from four incidents: "[Perry's] alleged statements that he did not understand why Tequila could not be around the children; one visit at the DHS office out of all the visits throughout the case where Tequila was seen getting into [Perry's] car; DHS's belief that Tequila was seen one time in the parking lot of the apartment complex where [Perry] lived; and the home visit in May 2022 where DHS believed Tequila to be present." Perry contends that "even if he did [previously] state that he did not understand why Tequila could not be around the children, it was clear that by the time of the termination hearing, he understood and stated that he would call the police if Tequila showed up while the children were in his custody." Additionally, Perry argues there was no testimony that he was aware of Tequila's presence at his apartment or that he arranged for her to be there. He also urges that there was no proof that Tequila was the person present at the home visit. He stated that there was no evidence or testimony provided that indicated he and Tequila were living together, had

---

[1]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)* (Supp. 2021).

17

been around one another, or had been in direct contact with each other. Perry argues that it was clear at the termination hearing that he had "made the decision to separate from Tequila."

In support of his contention that the termination of his parental rights was clearly erroneous, Perry relies on *Duncan v. Arkansas Department of Human Services*,[2] in which we found speculation of a continued romantic relationship between the parents insufficient to terminate parental rights. Perry argues that without any more evidence of his continued involvement with Tequila, the termination was based on pure speculation. *Duncan* is readily distinguishable. Here, unlike in *Duncan*, the circuit court specifically found Perry to be not credible, including his self-serving testimony that he separated from Rice. Further, in *Duncan*, there were no specific incidents cited that would indicate a continued relationship between the parents nor was there a pattern of being less than truthful to DHS or the court. Caseworkers testified to multiple occasions in which Tequila was either believed to be in Perry's home or actually seen near Perry's home or vehicle. Despite Perry's argument to the contrary, the testimony of the caseworker and the program assistant that Perry and Tequila continued to be involved in a relationship and remained in contact extends beyond mere speculation.

During a random home visit to Perry's prior residence in May 2022, only a few months before the termination hearing, a female was found hiding under blankets on a mattress in the front room. When caseworker Bradley inquired about the person's identity, Perry said it was a "white girl" he works with. Bradley, however, saw the arm of a black person. Perry refused to state who the person was, laughed about the situation, and just stated it was someone he works with. Caseworker Phillip Liddekee testified that the person in Perry's bed was Tequila. He did not see

[2]2014 Ark. App. 489.

her face, but he recognized the vocal sounds, moaning, and groaning as those identical to sounds Tequila makes when she is angry. The majority argues there is no proof that the person was Tequila and that Perry claims it was Tequila's cousin.

After a visitation between Perry and the children, Tequila was seen getting into Perry's vehicle. There is no dispute that it was, in fact, Tequila. The majority, however, minimizes this incident by stating that there was no time frame given for when Tequila entered the vehicle. During another visitation, Perry allowed Tequila to call and talk to the children.

Tequila was also spotted in the parking lot of Perry's new apartment complex. Liddekee stated that Tequila "took off running" when she saw him. When asked if it was possible that Tequila was there visiting someone else when she was spotted in the parking lot of his new apartment complex, Perry responded, "No. No." The majority diminishes this incident by stating there was no testimony regarding proximity to Perry's apartment.

Perry was aware of Tequila's mental-health issues and explosive anger. He was also aware that Tequila repeatedly volunteered to relinquish her parental rights to the children and refused to participate in services, and as a result, she was prohibited from having contact with the children. The emotional well-being of the children cannot arguably be served by access to such a parent, yet Perry stated throughout the case that he did not understand why Tequila could not be around the children. Although he testified at the hearing that he would "call the police" if Tequila showed up and would not allow her to be around the children, his pattern of dishonesty and evasiveness supports the circuit court's determination that, regarding Perry, "There's no credibility there whatsoever."

The majority does not describe one incident regarding Perry's "speculative" continued contact with Tequila; there are many incidents discussed. However, the majority downplays each one,

19

assesses each in isolation instead of cumulatively. Catching Perry and Tequila arm in arm or obtaining photographic proof is not the standard to prove continued contact, is it? The majority focuses on what the evidence lacks by way of picking apart the instances and testimony of the witnesses. However, the ability to minimize each instance does not equate to lack of evidence to support the circuit court's finding. Taken in the aggregate, I would hold there is sufficient proof of a continued relationship between Perry and Tequila, not mere speculation.

As a reminder, in the initial stages of the case, Perry refused to disclose the location of the children. At the probable-cause hearing, Perry stated that the children were being cared for by a family member and that he did not know Tequila's location. The probable-cause order states that "Mr. Perry shall be held at the Lonoke County Jail until he discloses the location of the children and the children are located."

The circuit court then issued an order to hold providing:

> On the 10th day of November 2020, Lester Perry continued to refuse to give the physical location of three of his children, [MC2, MC3, and MC4]. The children had previously been left with an individual that did not want to care for the children. DHS took a hold on the children and have not been able to locate the children. The Department has gone to a location that Lester Perry stated the children would be with his sister. His sister did not live at that location.

> Based upon the Court's concern for the children, the Court ordered Lester Perry into custody of the Lonoke County Sheriff's Department.

> When Lester Perry gives DHS the location of the children and the children have been located at that address, then Mr. Perry may be released from the Lonoke County Jail.

An order to release Perry from the Lonoke County Detention Center was entered on November 16, stating that the children had been located and taken into the physical custody and care

of DHS. Tequila brought the children to the police department on November 16 after Perry was detained. Perry admitted that the children were with Tequila the entire time.

At the adjudication hearing, Tequila informed the court that she did not want to work services and that she wanted Perry to have custody of the children. At the November 2021 hearing, Tequila acknowledged that she is mentally ill. During a violent episode, Tequila "busted out the door" at the DHS office. The majority states that while "there was testimony that Tequila destroyed property at a DHS office, there was no testimony that she had ever physically harmed the children, [Perry], or anyone else." Is that the requirement? Is continued contact with a person admittedly suffering from mental-health and anger-management issues safe for children to be around until physical harm or injury actually occurs? That has never been the standard and it should not be here.

The majority states that although there were allegations of property damage caused by Tequila, that is insufficient to terminate Perry's parental rights if there is no evidence that he was explicitly ordered to have no contact with Tequila. Parents are tasked with the responsibility of keeping their children safe and assessing situations and people that pose a possible risk to their children's safety, welfare, and well-being. Perry exhibits poor parenting decisions and judgment when it comes to Tequila and the children sufficient to amount to a subsequent factor to support termination of parental rights.

Further, Perry has lied to the court and DHS when it comes to Tequila and the children. He was only forthcoming about the children's location after spending a few days in jail. It is not a stretch for the circuit court to believe the testimony of the caseworkers and disbelieve Perry's testimony regarding his relationship with Tequila. The circuit court was well within its province to find Perry not credible.

It is also worth noting that, at the time of the termination hearing, Perry did not have a valid driver's license due to outstanding tickets and fines. Perry testified that although his visitation with MC1 had been increased, he had not yet started to exercise that increased visitation, explaining, "I just haven't, I guess, reached out to get that set up to get the transportation issue set up." This is further evidence that Perry is not stable enough to care for all of the children. He cannot even take advantage of the time that he has been granted with the eldest child. Yet, we are to find that he has achieved the stability to care for multiple younger children full time, on his own?

Perry stated he had no intention of allowing Tequila to have contact with the children. However, he also testified that he has no concerns that Tequila is mentally ill because she never hit the children. When asked again, Perry stated that Tequila does have mental-health problems, but he does not think she would be harmful to the children. Tequila has exhibited violent behavior and had pending charges for battery at the time of the termination hearing. Because of Perry's inability to comprehend the seriousness of the situation, I am unconvinced that he would protect the children from Tequila. I would affirm the circuit court's termination of Perry's parental rights.

Perry also challenges the circuit court's finding that termination of his parental rights was in the children's best interest. An analysis of best interest includes consideration of the likelihood the children will be adopted and of the potential harm caused by returning custody of the children to the parent.[3] In challenging the circuit court's best-interest determination, Perry does not attack the adoptability prong of the circuit court's best-interest finding; therefore, he abandons all arguments

---

[3]*Norton v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 285.

on appeal concerning this prong.[4] Instead, he challenges the potential-harm factor of the circuit court's best-interest finding. In considering potential harm caused by returning the child to the parent, the circuit court is not required to find that actual harm would result or affirmatively identify a potential harm.[5]

Perry argues that DHS failed to present any credible evidence that the children would be at risk of harm if returned to him. Perry asserts that "[e]ven if he had a few contacts with Tequila throughout the case, flawless compliance is not required in order to avoid termination of parental rights." Citing *Mason v. Arkansas Department of Human Services*,[6] Perry contends that slight lapses in judgment do not justify permanently removing his children from him and forever severing the bond between them.

In *Mason*, the father was in a relationship with a woman with prior felony and misdemeanor drug convictions. While the woman had not provided any drug screens, there was no evidence that the woman was asked to participate in a drug screen prior to the day of the termination hearing. The woman no longer lived with Mason, was driving him to visitations, and Mason had not been informed that preservation of his parental rights hinged on his ending the relationship. Also at the hearing, the woman was willing to submit a blood sample. The circuit court found that in light of Mason's unrefuted compliance, progress, and bond with his child, his association with the woman could not justify the severing of his parental rights. While the partner in *Mason* had a criminal history, the

---

[4]*See Burkhalter v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 520.

[5]*Gulley v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 367, 498 S.W.3d 754.

[6]2022 Ark. App. 124, 642 S.W.3d 260.

evidence demonstrated that she was willing to participate in services and aid Mason in working toward reunification. In this case, Perry continued to associate with Tequila, who refused services, failed to visit the children, exhibited violent outbursts causing property damage to the DHS office, and suffered from mental-health issues and instability. Perry's refusal to protect the children from Tequila demonstrated poor parenting decisions and a risk of potential harm. We agree with Perry's argument that he does not have to prove that he is a "perfect parent" to retain his parental rights. However, continuing to expose the children to a parent with mental-health issues and failing to appreciate the necessity of protecting them from Tequila is not an isolated lapse in judgment nor is it merely falling short of being a perfect parent.

In sum, I would affirm the circuit court's finding of statutory grounds and its best-interest determination and resulting order terminating Perry's parental rights to MC2 and MC3.

For the reasons stated herein, I respectfully dissent.

GRUBER, J., joins.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.