Cite as 2026 Ark. App. 258

# ARKANSAS COURT OF APPEALS
## DIVISION II
No. CV-25-731

| | |
|---|---|
| ALEXIS WELSH | Opinion Delivered April 29, 2026 |
| APPELLANT | |
| | APPEAL FROM THE HOT SPRING COUNTY CIRCUIT COURT [NO. 30JV-23-82] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE STEPHEN L. SHIRRON, JUDGE |
| APPELLEES | AFFIRMED |

**BART F. VIRDEN, Judge**

Alexis Welsh appeals the Hot Spring County Circuit Court order terminating her parental rights to MC2, who was two years old when she was removed from Alexis's custody.[1] Alexis argues on appeal that the circuit court was without statutory authority to consider the Arkansas Department of Human Services' (the Department's) termination petition because MC2 had been placed in her father's permanent custody. She also challenges the court's best-interest finding, arguing that there is insufficient evidence of potential harm. We disagree and affirm.

---

[1]Alexis's other children, MC1 and MC3, are not parties to this appeal. The termination of Alexis's parental rights to MC1 and MC3 is the subject of the companion case, *Welsh v. Arkansas Department of Human Services*, 2026 Ark. App. 259, ___ S.W.3d ___, also handed down today.

I. *Relevant Facts*

On June 19, 2023, the Department exercised a seventy-two-hour emergency hold over MC1 (age 4), MC2 (age 2), and MC3 (newborn) on June 19, 2023. On June 23, the Department filed a petition for dependency-neglect regarding the children and named Johnathon Mason as MC1's father. MC3's father was not identified during the case. The court identified Christopher Krum as MC2's putative father.

In the affidavit attached to the petition, the Department alleged the following. MC3 tested positive for amphetamines at birth. Alexis tested positive for methamphetamine and amphetamines, though she initially denied drug use. Later, she admitted she had recently taken pills and snorted an unknown substance. Alexis's parents had physical custody of MC1 and MC2, but Alexis refused to tell the caseworker where they were. When the caseworker went to Alexis's mother's home, the driveway gate was locked, and she refused to respond to the caseworker's honking or phone calls. Eventually, the caseworker was able to assess the home and found it piled high with trash, boxes, and clothing and smelling strongly of trash and rotten food. Alexis was drug tested, and the test was invalid due to the temperature of the sample. Alexis denied having a drug problem and refused inpatient treatment. The children were removed due to Alexis's drug abuse, Garrett's Law, Alexis's hindering the investigation, and the previous maltreatment of a child in her care.

An ex parte order for emergency custody was entered on June 23. The court found that the Department had been involved with the family since August 13, 2018, and Alexis had received services that had not prevented the children's removal from her custody. On

July 7, the circuit court entered the probable-cause order, finding that there was probable cause that emergency conditions necessitated the removal of the children from Alexis's custody. The August 15 adjudication order reflected Alexis's stipulation that the children were adjudicated dependent-neglected. The court set the goal of the case as reunification.

In the February 8, 2024 review order, the court found that Christopher, who lived in Texas, is MC2's father, and the court was waiting for the Interstate Compact on the Placement of Children (ICPC) home study to be completed before it could consider placement with him. He was found to be compliant with the case plan. Alexis had completed a twenty-eight-day inpatient treatment at Harbor House but had not followed the recommendation that she complete sixty-day inpatient treatment. Alexis had attended visitation and completed her psychological evaluation and submitted to drug screening. The goal of the case continued as reunification.

In the May 16 review order, the court found that Alexis, Johnathon, and Christopher were compliant with the case plan, and the goal remained reunification.

On May 30, the circuit court granted Christopher's petition for MC2's expedited placement under the ICPC, pending the Department's home assessment and the Texas authority's written notification that the placement does not appear to be contrary to her best interest.

On June 10, the court entered the permanency-planning order, changing the goal of the case to placement with a parent, guardian, or custodian. All three parents were found to have complied with the case plan.

On October 8, the circuit court entered the fifteen-month review order, changing the goal of the case. Regarding MC1 and MC3, the court authorized a plan for termination and adoption. As to MC2, the court continued the goal of reunification because of Christopher's progress and dedication to the case plan. Alexis was found to have partially complied with the case plan. She had tested positive for drugs and had not submitted to the recommended second drug-and-alcohol assessment. She had been living with her mother, who had recently died, and she was not sure if she would inherit the home and continue living there. She had arrived late to visitation and had not provided proof of employment.

The Department filed the termination petition seeking to terminate the parental rights of Alexis and Johnathon on October 29. The Department alleged several statutory grounds, including twelve-month failure to remedy, subsequent issues, and aggravated circumstances—little likelihood. The Department alleged that the children are adoptable, and potential for harm existed if the children were returned to Alexis's custody.

On April 23, 2025, the circuit court entered a review order and permanent-custody order regarding MC2. Christopher was declared a fit parent, and the court ordered that MC2 be placed in his permanent custody. Alexis had not complied with the case plan, and the court found that she remained unfit.

The circuit court held a termination hearing regarding MC2 on July 9. Alexis testified that she had not used amphetamines or methamphetamine in two months, and she had contested the positive test result for marijuana because she did not use it, but the people she was around did. Alexis explained that she completed Harbor House's twenty-eight-day

treatment and was awaiting a spot in a shelter for women and their children when she left the program because her mother was sick and dying. She relapsed at first, but she had avoided drug use in the last couple of months by having a job and a routine schedule that kept her focused. She had not been able to get into a counseling program. She lived in her deceased mother's three-bedroom home, but the home was in probate, and she was not sure what the outcome would be. Alexis testified that she had attended visitation, but she did not have a car and relied on people to drive her. Alexis explained that she was currently driving a Toyota Corolla and that it was operable, though it needed a new fuel pump. She explained that she wanted to coparent MC2 with Christopher and have visitation, and she did not believe that her rights should be terminated. She stated that she would not test positive for drugs if tested that day. Counsel then asked her if she recognized a purse that had been found in a bathroom in the courthouse. Alexis denied that the purse belonged to her and stated that she did not recognize the drug-related items inside the purse.

Christopher testified that MC2 was in his permanent custody and had been living with him for several months. He reported that MC2 was happy and loved playing, swimming, and swinging. Christopher explained that he had moved from Texas to Arkansas to facilitate getting custody of MC2. Christopher was employed at Window Mart. Christopher explained that visitation with Alexis was not for Alexis's benefit but more for the three children to see each other. He stated that when Alexis arrived for visitation, she sat in her car doing various things anywhere from half an hour to an hour and a half. Other times she stayed in the bathroom for part or most of the visit. Christopher stated that Alexis held and kissed MC2

5

but did not play with her. He stated that Alexis seemed to focus on MC2 rather than her siblings. Christopher recalled that sometimes Alexis brought men with her to visitation, and once she took MC2 out to a car to see a man who was sitting in the car. He estimated that she had missed over twenty visits.

Kim Sowell testified that she had been the supervisor for this case since it began. Sowell explained that when this case began, there was a protective-services case already open on the family. Sowell stated that Alexis had participated in some services, including psychological evaluation, parenting classes, and drug-and-alcohol assessment; and she had partially completed inpatient treatment. Sowell stated that Alexis had not provided her with a pay stub or proof of employment. Since the last hearing in April, Alexis had tested positive for amphetamines and methamphetamine. She stated that a negative result would be 50 nanograms, and Alexis tested at 7996.1 nanograms for amphetamines and "greater than 10,000" for methamphetamine. Sowell testified that Alexis admitted relapsing at times during the case and explained, "Usually that's been when she has been arrested for some reason or another." Sowell recalled that Alexis exercised visitation sporadically, which confused the children because they did not know whether their mother was going to be there. Sowell stated, "I can't say that they go bad during the visitation time, but I also can say that Ms. Welsh is not always present during the visits." Sowell commended Christopher for expediting MC2's placement with him by moving to Arkansas. She also noted that Christopher had tried to help Alexis by driving her to visitation and allowing her to live with him for a while.

After closing, counsel explained that there was possible new evidence, and the court left the record open to make a determination on the issue. The bailiff explained to the court that courthouse staff reported two women leaving backpacks in a restroom downstairs, one of whom was Alexis. The backpacks contained drug paraphernalia, containers of urine, and other "narcotic items." Alexis had been arrested. The court set a hearing for July 23.

Alexis did not appear for the July 23 hearing. Sowell testified that Alexis's drug screen on July 9 at the courthouse before the hearing was positive for bupropion, but the sample was too small to register a temperature. The drug screen at the jail later that day was positive for amphetamines and methamphetamine. Sowell stated that at the jail, Alexis was intoxicated, slurring her words, and was unable to answer questions without "tak[ing] off on different rabbit trails." Sowell again recommended terminating Alexis's parental rights.

The circuit court entered the order terminating Alexis's parental rights to MC2 on August 29. The court found that the following statutory grounds supported the termination of Alexis's parental rights: twelve-month failure to remedy, subsequent issues, and aggravated circumstances—little likelihood.[2] The court found that it was in MC2's best interest to terminate Alexis's parental rights due to the potential harm that could result if MC2 was returned to Alexis's custody. The court determined that the issue of adoptability was not legally relevant in this case because Christopher's parental rights would not be terminated,

---

[2]Ark. Code Ann. §§ 9-27-341(b)(3)(B)(i) (Supp. 2023); 9-27-341(b)(3)(B)(vii)*(a)*; 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*.

7

and MC2 was in his custody. The court found that the case history, the July 9 incident regarding the backpack in the courthouse, and Alexis's subsequent positive drug screen and arrest supported the potential-harm finding. The court noted and denied Alexis's objection that there was no reason to terminate her parental rights because "an order for supervised visits would suffice."

The order terminating Alexis's parental rights to MC1 and MC3 was entered on October 6.

Alexis timely filed her notice of appeal from the order terminating her parental rights to MC2.

## II. *Discussion*

### A. Standard of Review

We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Hum. Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001). The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. We will not reverse the circuit court's decision unless its findings are clearly erroneous. *Perry v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 323, 669 S.W.3d 865. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

### B. Points on Appeal

#### 1. *Statutory authority*

For her first point on appeal, Alexis argues that the circuit court erred as a matter of law by terminating her parental rights without statutory authority.[3] Specifically, she claims that Ark. Code Ann. § 9-27- 341(b)(1)(A) authorizes the court to consider termination only when it finds that an appropriate permanency-placement plan exists for the juvenile. The permanency goals set forth in Ark. Code Ann. § 9-27-338(c) in order of preference include, first and foremost, placing custody of the juvenile with a fit parent. Ark. Code Ann. § 9-27-338(c)(1). Alexis did not raise the specific argument she raises now, and the circuit court did not rule on the issue.

During her testimony at the termination hearing, Alexis asserted that she wanted to coparent with Christopher and have visitation with MC2, and she disagreed that he should have sole custody of MC2. She did not argue, as she does now, that "the termination statute did not apply, and the court erred as a matter of law in proceeding on the petition." A party cannot change the grounds for an objection or motion on appeal but is bound by the scope and nature of the arguments made before the circuit court. *Washington Cnty. v. Coger*, 2025 Ark. App. 145, 709 S.W.3d 827.

The failure to raise a challenge or obtain a ruling below is fatal to the appellate court's consideration of an issue on appeal. *Lamontagne v. Ark. Dep't of Hum. Servs.*, 2010 Ark. 190, 366 S.W.3d 351. The parent, as the appellant, has the burden of bringing a record before this court sufficient to decide the issue presented. *Miller v. Ark. Off. of Child Support Enf't*,

---

[3]Alexis does not challenge the sufficiency of the evidence supporting the circuit court's statutory-grounds finding.

2015 Ark. App. 188, 458 S.W.3d 733. For a circuit court to have committed reversible error, timely and accurate objections must have been made so that the circuit court was given the opportunity to correct the error. *Id.* It is the duty of the party seeking the relief to obtain a ruling from the circuit court. *Id.* When a party seeking relief fails to obtain a ruling on the specific issue, the appellate court is precluded from reviewing the issue on appeal. *Id.*

Accordingly, we affirm on this point without reaching the merits of Alexis's argument.

2. *Permanent placement of MC2 with her father*

For her second point on appeal, Alexis challenges the court's best-interest determination, asserting that the circuit court's potential-harm finding is not supported by sufficient evidence because MC2 had been permanently placed with Christopher. Specifically, she contends that termination was "punitive" because MC2 had achieved permanency when she was placed with her father, and "any remaining concerns could have been addressed through a specific visitation order rather than the drastic remedy of termination."[4] Her argument is not well taken.

Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights. *Bentley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 374, 554 S.W.3d 285. The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to

---

[4]Alexis does not challenge the court's determination that adoptability was not a legal issue in this case; therefore, we are not required to address the court's finding. *See Easter v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 441, 587 S.W.3d 604.

10

the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3); *Lyall v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 81, 661 S.W.3d 240. As such, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Bentley*, 2018 Ark. App. 374, at 5, 554 S.W.3d at 289.

To terminate parental rights, the Department must prove by clear and convincing evidence that a minimum of one statutory ground exists, and it is in the child's best interest to do so. Ark. Code Ann. § 9-27-341. Clear and convincing evidence is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Bentley*, 2018 Ark. App. 374, at 4–5, 554 S.W.3d at 289. In finding that termination is in the best interest of the child, the circuit court is required to consider the likelihood that the child will be adopted if the petition is granted and the potential harm to the health and safety of the child that might result from returning the child to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3)(A). It is the overall evidence—not proof of each factor—that must demonstrate that termination is in the child's best interest. *Cole v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 481, at 9, 611 S.W.3d 218, 223.

The court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Samuels v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 527, 443 S.W.3d 599. A parent's past behavior is often a good indicator of future behavior and may

11

be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Shawkey v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 2, 510 S.W.3d 803.

Alexis's argument that a less restrictive alternative disposition—a visitation order—would have sufficed here does not take into account the facts of this case. Visitation throughout the two-year case was counterproductive at best. Alexis often spent the bulk of the visitation time in the car or in the bathroom and was "not always present." Additionally, Christopher testified that during visitation, Alexis took MC2 outside to the car to see the man who had driven Alexis that day. He also testified that Alexis showed a preference for MC2 and ignored MC1 and MC3. Christopher recalled that Alexis would hold and kiss MC2, but she did not play with her. The caseworker testified that the children did not know whether their mother would come to or participate in visitation, and it caused uncertainty and instability for them. The circuit court's potential-harm finding is supported by sufficient evidence.

We note that Alexis compares the instant case to several cornerstone cases involving permanent placement and termination of parental rights; however, each case she cites is factually distinguishable: *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102 (preservation of the established grandparent relationship that would end if parental rights terminated); *Lively v. Arkansas Department of Human Services*, 2015 Ark. App. 131, 456 S.W.3d 383 (other considerations were that there was no evidence of adoptability and the need to preserve the grandparent relationship); *Cranford v. Arkansas Department of Human Services*, 2011 Ark. App. 211, 378 S.W.3d 851 (father had demonstrated stability in housing

12

and employment and was going to be released from prison in six weeks); and *Bunch v. Arkansas Department of Human Services*, 2017 Ark. App. 374, 523 S.W.3d 913 (mother had complied with the case plan and reunification was likely with a little more time.) Alexis's comparison of the instant case to the caselaw above is unpersuasive, and we find no error in the circuit court's best-interest finding.

Accordingly, we affirm.

Affirmed.

ABRAMSON and HARRISON, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services Office of Chief Counsel, for appellee.

*Linda J. Hamilton*, attorney ad litem for minor child.